IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
v.                               )        No. 3:19-CR-22-KAC-DCP
                                 )
DEWAYNE SMITH,                   )
                                 )
            Defendant.           )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter is before the Court upon Defendant Smith's Motion to Suppress [Doc. 142], filed on May 30, 2022, in which he argues that law enforcement's search of the parked vehicle he was an occupant in violated the Fourth Amendment. The Government filed a response in opposition to the motion [Doc. 143] on June 13, 2022. The Court set the motion for an evidentiary hearing on July 19, 2022 [Doc. 145]. Assistant United States Attorney Casey Arrowood appeared on behalf of the Government. Attorney Michael Menefee represented Defendant Smith, who was also present. After hearing the arguments of counsel, the Court took the motion under advisement.

After reviewing the parties' briefs and arguments, the evidence and exhibits presented at the hearing, and the relevant legal authorities, the Court recommends that Defendant's Motion to Suppress [Doc. 142] be denied.

# I.     POSITIONS OF THE PARTIES

Defendant is charged [Doc. 3] with conspiracy to commit bank fraud by presenting counterfeit credit cards to retail stores in order to obtain merchandise and gift cards from retailers (Count 1), bank fraud (Counts 2 and 3), and aggravated identify theft (Counts 8 and 9).  Defendant seeks [Doc. 142] to suppress all evidence seized from the allegedly illegal search of a 2014 Buick Regal ("Buick Regal," "Buick," "car," or "vehicle") at the Walmart parking lot in Lenoir City, Tennessee, on July 1, 2018.  Defendant asserts that law enforcement lacked probable cause to search the vehicle, as the only information the officers had was a report from a Walmart employee that a black male had purchased gift cards using more than one payment method.  Defendant maintains that the officers had no reason to believe the vehicle contained evidence of a crime and that they were on an unlawful fishing expedition.  Defendant argues that no exception to the warrant requirement applies.  First, Defendant points to the Government's contention that Defendant and his companion were detained but not arrested at the time of the search and argues that the officers could not search the car incident to arrest.  Next, Defendant asserts that neither he nor the other occupant of the vehicle gave consent to search the car.  Further, Defendant maintains that the automobile exception does not apply because the officer lacked probable cause to believe the car contained evidence of a crime.  Finally, Defendant contends that an inventory search was not appropriate because the car was not lawfully in police custody.

The Government responds [Doc. 143] that law enforcement had probable cause to search the vehicle and reasonably conducted an inventory search on it.  Specifically, the Government argues that based on the totality of the circumstances at the time of the search, the officers knew from the initial dispatch report that an individual, later identified as Codefendant Morgan, was possibly using stolen credit cards at the Walmart, that a second person was involved, and that the

suspects were using a Buick Regal. The Government describes that when the first officer arrived and located the vehicle in the Walmart parking lot, he encountered Codefendant Morgan, who matched the physical description of the suspect, seated in the back seat on the driver's side and Defendant located in the front passenger seat. Additionally, a third individual, later determined to be Codefendant Hopkins-Brown, had fled the scene.

After other officers arrived on scene, they questioned Codefendant Morgan, who provided false identification information. The Government maintains that the officers saw numerous credit/debit or gift cards in plain view inside the vehicle and that this, coupled with the other information, gave the officers probable cause to believe the car contained evidence of identity theft, criminal simulation, and criminal conspiracy. Moreover, the Government contends that law enforcement's search of the vehicle was permissible as a search incident to a lawful arrest and inventory search, as both occupants of the Buick had been arrested and were being transported to the Lenoir City Police Department ("LCPD") and the officers were aware a third suspect had fled the scene and would likely have access to the vehicle.

## II.    SUMMARY OF TESTIMONY

At the July 19 hearing, the Government presented the testimony of Officer Tyler Silvey ("Officer Silvey") and Sergeant Ronnie Reagan ("Sergeant Reagan") from LCPD. Defendant Smith presented no witnesses. The Government offered as exhibits the dash camera footage from Officer Silvey's patrol car [Exh. 1], Sergeant Reagan's body camera footage [Exh. 2], and the LCPD Towing Policy ("LCPD Policy") [Exh. 3]. The Court summarizes the witnesses' testimony and exhibits as follows:

Officer Silvey, a LCPD patrol officer, testified that on July 1, 2018, he received a dispatch call advising that there were three males at the Walmart self-checkout who were buying multiple

prepaid gift cards and using different cards to pay for them. Dispatch also relayed that the subjects were seen walking to a gray or silver Buick Regal on the garden side of the parking lot and that one male was wearing a Pittsburgh Pirates hat.

With the aid of his in-car video recording [Exh. 1], Officer Silvey testified that as he approached the vehicle in the Walmart parking lot, he encountered two individuals—one in the front passenger seat and the other, wearing a Pittsburgh Pirates hat, seated in the back on the driver's side. He stated the third subject was not around the vehicle, adding that dispatch had relayed that the third man had walked out with the other two and then walked towards the Home Depot. At the 12:49 time stamp, Officer Silvey explained that neither of the suspects had been detained at that point, but he noted that when Defendant walked back to the vehicle and opened the passenger side front door, he saw multiple credit cards laying in and between the seat and inside the front door pocket.[1] Officer Silvey stated that he did not search the vehicle at that time, explaining that the vehicle was later searched when it was being inventoried for towing.

In terms of informing his decision to tow the vehicle, Officer Silvey stated that one of the male subjects at the vehicle had a suspended driver's license and the other did not have one. He testified that the third subject, who was not present, had the keys to the vehicle and was never located. In reviewing the in-car video, Officer Silvey detailed that at 1:11 p.m., he was placing handcuffs on Defendant and that at 1:13 p.m., the officers were getting the vehicle prepared for inventory prior to being towed. He testified that he and Sergeant Reagan conducted the inventory search of the vehicle. During the search, they discovered multiple credit cards, debit cards, IDs,

---

[1] Officer Silvey testified that he had responded to ten or more calls on crimes involving credit cards, and based on his experience, he expects to find credit cards not belonging to the subject of the investigation and multiple identifications for persons other than the subject.

4

Apple iTunes cards, and a credit card scanner. Following the search, the vehicle was towed to Malone's wrecker yard, and a search warrant was eventually executed on the vehicle.

On cross-examination, Officer Silvey reiterated that dispatch had advised him that three male subjects at Walmart were using multiple credit cards to purchase refillable credit cards, gift cards, and iTunes cards.[2] He reviewed that he arrived at 12:23 p.m. and knocked on the car window, motioning for the occupants to exit the vehicle. Then, at 12:49 p.m., the video depicts Officer Silvey reaching into the front passenger seat picking up some of the cards, which he testified were laying on top of the seat. At that point, Officer Silvey stated he had not detained Defendant, because he was still investigating the reason that he (Officer Silvey) was at the Walmart; however, at approximately 1:10 p.m., both subjects were arrested with one being placed in the back of Sergeant Reagan's patrol car and the other in the back of Officer Silvey's patrol car. Officer Silvey testified that with both occupants of the vehicle being under arrest, they began the inventory search of the vehicle at around 1:13 p.m. The two subjects were eventually transported to the LCPD.

On redirect examination, Officer Silvey testified that neither of the two occupants of the vehicle had a valid driver's license, and thus, they were unable to lawfully drive the vehicle. He stated that it was unknown at the time whether the third subject, who was not on the scene, could have driven the vehicle.

Finally, in response to questioning from Mr. Arrowood on redirect and Mr. Menefee on recross, Officer Silvey clarified that the call received by dispatch was from Walmart loss prevention reporting that the male subjects were purchasing multiple gift cards and, when the

---

[2] Officer Silvey used various terms to describe the type of cards in the vehicle, including "credit cards," "debit cards," "refillable credit cards," "gift cards," "prepaid credit card," and "reloadable credit cards," and specifically noted iTunes cards. For ease of reference, they will be generally referred to as "cards."

charges were declined, they used different credit cards to attempt the purchases, which raised a red flag. Officer Silvey acknowledged that using different credit cards to purchase multiple gift cards was not against the law.

The Government also called Sergeant Ronnie Reagan, who is the day-shift supervisor for LCPD. He testified that he graduated from the police academy in 1988 and that he has been to several specialized training schools over the past thirty years. While working for LCPD, he has responded to several crime scenes where the alleged crime is related to credit cards. Sergeant Reagan detailed that the types of things he would expect to find at such a suspected crime scene included credit cards, IDs, Social Security numbers, and other related items.

Sergeant Reagan related that while he was on duty on July 1, 2018, law enforcement was dispatched to the Walmart in Lenoir City due to some suspicious activity relating to people using credit cards in the store and that he was the second or third officer to arrive on the scene. In terms of other information he knew at the time, Sergeant Reagan added that there was a description of a vehicle and of three males who had been "swapping cards" at one of the self-checkouts.

In reviewing a clip from his body camera footage [Exh. 2], Sergeant Reagan testified that prior to locating any cards on the scene, he had asked dispatch to call Walmart and ask if they wanted the vehicle left in the parking lot or towed. He confirmed that neither of the two subjects on the scene had a driver's license, and therefore, they were unable to lawfully drive the vehicle.

After viewing another video clip, Sergeant Reagan responded to questions, explaining that he was involved in the decision to tow the vehicle and to conduct an inventory search and that before the decision was made, he had consulted with his chief. He did not, however, participate in the inventory search or the later search conducted pursuant to the search warrant. Sergeant

Reagan then reviewed the LCPD Policy [Exh. 3]. Specifically, he read paragraphs 3(a) and 6(c), which state as follows:

> 3(a): These are the occasions when an officer may lawfully seize a vehicle as a result of the violation of a statute, ordinance, or traffic regulation where this is provided. Examples of impound situations may be on arrest of a D.U.I. driver, or on the recovery of a stolen vehicle. When impounding vehicles, officers shall comply with all areas of this general order in respect to Pull Slips, requests for wrecker services, etc.
>
> 6(c): Officers shall make a complete inventory of all property in the vehicle and shall record this property on the Pull Slip. Officers may open locked compartments *(with a key)* and may open closed containers to inventory their contents, but shall not force open any locked containers by breaking the lock.

[Exh. 3 pp. 2–3 (emphasis in original).

On cross-examination, Sergeant Reagan testified that when he was dispatched to Walmart, he knew there were individuals swiping cards for some reason at the self-checkout. He confirmed that at the 12:44 time stamp in the body camera video, he starts to put handcuffs on one of the subjects and states, "You're going to jail." He also acknowledged that just a minute before that, he said something to the effect of, "I know these guys are up to no good." While he confirmed that there were some cards taken from the vehicle, Sergeant Reagan clarified that he had not retrieved them. He also stated that Officer Silvey advised him of some receipts that were found with the cards in the vehicle.

Sergeant Reagan was questioned about certain alternatives to impoundment that are described in section 5 of the LCPD policy. First, he was asked whether any attempt was made to release the vehicle to the owner. Sergeant Reagan testified that he assumed the owner of the vehicle was the man who fled on foot, and he confirmed that between the time of arriving on scene at about 12:13 p.m. and starting the search of the vehicle around 1:12 p.m., the man never returned.

Next, Sergeant Reagan was asked whether he attempted to reach the owner by any means, including electronic means, to which he replied, "We had no way to reach him, no." He testified that he did not attempt to run the tags on the vehicle but assumed Officer Silvey had done so, and he added that running a registration provides only a name and address but no contact telephone numbers. Then, Sergeant Reagan was asked about the option of finding an alternate driver. He reiterated that neither of the two subjects at the scene could drive the car because they did not have a valid driver's license. He acknowledged that he did not give either of them an opportunity to call someone to the scene to pick up the car. After that, Sergeant Reagan was questioned about the third option of leaving the vehicle in place, if it can remain lawfully parked. He agreed that the car was lawfully parked at Walmart and that it could have remained there if Walmart would have allowed it to stay. He also agreed that if someone left an abandoned vehicle at Walmart, a tow company would take the vehicle to a tow yard. Finally, Sergeant Reagan was asked about the last option of allowing Defendant the opportunity to call a wrecker company for towing and storage service. He testified that was not an option in this case because Defendant was not the owner of the vehicle.

On redirect examination, Sergeant Reagan confirmed that based on what he saw on the scene at Walmart on July 1, 2018, the vehicle had evidentiary value. Further, he read a portion of section 5 of the LCPD Policy [Exh. 3], which states:

> If the vehicle is not to be retained by the Lenoir City Police Department for evidentiary or forfeiture purposes, officers shall first attempt to dispose of the vehicle prior to impoundment as follows: .
> . . .

Turning back to an earlier point in his body camera video, Sergeant Reagan was asked whether he ever inquired of the other two men concerning the name of the third individual who left the scene. He did not recall asking them himself, but stated they were asked about the name

of the third subject several times. Sergeant Reagan stated they responded that the name was Leon, Leroy, or something similar and, to his knowledge, they did not give the person's last name.

## III.    FACTUAL FINDINGS

Based upon the testimony of the witnesses and the exhibits in this case, the Court makes the following factual findings:

On July 1, 2018, an employee at the Walmart located in Lenoir City, Tennessee, called the LCPD to report that three male subjects were trying to purchase multiple prepaid gift cards at the self-checkout, and when the purchases were declined, and they kept using different credit cards to attempt the purchases. Dispatch relayed that two of the subjects were seen walking to a gray or silver Buick Regal on the garden side of the parking lot and that one was wearing a Pittsburgh Pirates hat. The third subject, later identified as Codefendant Hopkins-Brown, had exited the store with the other two men, but then walked towards the Home Depot.

According to the dash camera recording from Officer Silvey's patrol car [Exh. 1], he parked behind the Buick at the Walmart parking lot at approximately 12:24 p.m. Officer Silvey then approached the Buick and encountered two individuals—Defendant, who was in the front passenger seat, and Codefendant Morgan, seated in the rear seat on the driver's side and wearing a Pittsburgh Pirates hat. Officer Silvey tapped on the car window and motioned for the individuals to exit the vehicle.

At approximately 12:41 p.m.,[3] Sergeant Reagan arrived on the scene and asked the individuals why the third person "took off." Codefendant Morgan responded that he did not know. When officers asked the name of the third individual, Defendant responded "L.B." or "Leon," but neither knew the individual's last name. The third individual was not seen at or around the vehicle.

---

[3]    Sergeant Reagan's body camera recording of begins at this approximate time [Exh. 2].

Codefendant Morgan, who was reportedly seen at the Walmart checkout attempting to make the subject transactions, had no driver's license or any type of identification on his person and provided false identification to the officers at the scene. At 12:43 p.m. [Exh. 2], Sergeant Reagan frisked Morgan and located multiple gift cards on his person. Codefendant Morgan was placed in the back seat of a patrol car at 12:44 p.m. [Exh. 2]. The officers confirmed that Defendant's driver's license had been suspended.

At around 12:49 p.m., when Defendant opened the passenger side front door of the Buick, Officer Silvey saw multiple cards laying in and between the front passenger seat and inside the front door pocket.[4] At approximately 1:11 p.m. [Exh. 1], Defendant was placed in handcuffs and seated in the back of a patrol vehicle. The third individual (Codefendant Hopkins-Brown) never returned to the scene.

Around 1:13 p.m. [Exh. 1], the officers conducted a search of the vehicle prior to towing. During the search, multiple credit cards, debit cards, IDs, Apple iTunes cards, and a credit card scanner were discovered. Following the search, the vehicle was towed to a wrecker yard, and a search warrant was later executed on the vehicle.

## IV.    ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A vehicle is an 'effect' under the Fourth Amendment. *United States v. Jones*, 565 U.S. 400, 404 (2012). However, vehicles are afforded a "lesser degree of protection" from warrantless searches and seizures, and certain exceptions to the Fourth Amendment's warrant requirement apply to

---

[4]    On direct examination, Officer Silvey identified the 12:49 time stamp on [Exh. 1] as the beginning of the video clip depicting the occurrence.

them.  *California v. Carney,* 471 U.S. 386, 390 (1985).  Defendant argues that his Fourth Amendment rights were violated because the officers had no lawful basis to conduct a warrantless search of the Buick on July 1, 2018.  Defendant argues that no exception to the warrant requirement applies in this case,[5] specifically asserting that the vehicle inventory search exception to the warrant requirement does not apply because law enforcement lacked legal cause to take custody of the vehicle and the automobile exception does not apply because the officers lacked probable cause to search the vehicle for evidence of a crime.  Additionally, at the July 19 evidentiary hearing, the Court raised *sua sponte* the question of Defendant's standing to challenge the search of the vehicle.

The Court will begin by considering whether Defendant has standing to challenge the search of the Buick and then will turn to his arguments for suppressing the evidence seized during the July 1, 2018 warrantless search of the vehicle.

### A.     Standing to Challenge the Search of the Vehicle

"Fourth Amendment rights are said to be 'personal'" in that "the Fourth Amendment protects '[t]he right of the people to be secure in *their* persons, houses, papers, and effects, against unreasonable searches and seizures.'"  *United States v. Russell,* 26 F.4th 371, 374 (6th Cir. 2022)

---

[5]      Defendant also argued that neither consent, nor a search incident to arrest were permissible in this case, but the Court need not address these arguments.  With regard to consent, the Government does not claim that voluntary consent to search the vehicle was given or that consent provided an exception to the warrant requirement of the Fourth Amendment.  Therefore, it is not necessary for the Court to engage in an analysis of whether a voluntary consent exception applies in this case.  As to Defendant's argument that the vehicle was not lawfully searched incident to arrest because of the Government's contention that Defendant and his companion were "detained" but not under arrest at the time of the vehicle search  [Doc. 142 p. 3], the Government  does not claim a search-incident-to-arrest exception.   Further, and in any event, the Government acknowledged that both occupants of the vehicle (Defendant Smith and Codefendant Morgan) were in custody at the time of the search of the vehicle [Doc. 143 p. 3].  Accordingly, there is no basis for the Court to consider these alternative arguments posited by Defendant.

11

(quoting U.S. Const. amend. IV). Thus, "a defendant must show that 'his own' rights were 'infringed'" for the Fourth Amendment to apply. *Id.* (citations omitted). The "shorthand" term for this requirement is "standing," and it is a defendant's burden to demonstrate. *Id.* at 374, 377.

"[A] defendant has standing only if he has a Fourth Amendment interest in the property searched." *Id.* at 377. "This interest can either be a property or a privacy interest." *Id.* Generally, "a car passenger who didn't own or lease the car . . . has neither." *Id.* The passenger has no "privacy interest in the car" because they do not "have a legitimate expectation of privacy in the area[s]" within the car, including "under the passenger's seat." *Id.* A passenger also typically has "no property interest in the car because [they] [have] no ownership or possessory interest in it." *Id.* ("The record is clear that [the defendant] wasn't driving, and that the car belonged [to someone else].")

Notably, even in those cases in which the defendant was driving a car at the time it was stopped, this fact—without more—does not create the type of possessory interest necessary to give rise to a legitimate expectation of privacy protected under the Fourth Amendment. *See United States v. Taylor*, 496 F. Supp. 2d 852, 855–57 (S.D. Ohio 2006) ("Where the proponent of a motion to suppress is the car's driver but not the registered owner, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest.") (citing *United States v. Valdez Hocker*, 333 F.3d 1206 (10th Cir. 2003)); *United States v. Ruggiero*, 824 F. Supp. 379, 391–93 (S.D.N.Y. 1993) ("Numerous decisions from this Circuit confirm that mere control over a vehicle does not establish standing.") (collecting cases), *affirmed by United States v. Aulicino*, 44 F.3d 1102 (2nd Cir. 1995). Rather, the driver must demonstrate that he owned the vehicle or "obtained possession from the owner of the vehicle or someone authorized by the owner to give him possession of the vehicle." *Taylor*, 496 F. Supp. 2d at 856.

During the hearing, there was no evidence presented that would suggest that Defendant was the driver of the vehicle, and Officer Silvery testified that the third subject (Codefendant Hopkins-Brown), who was not present at the scene, had the keys to the vehicle. When the Court raised the question of Defendant's Fourth Amendment standing, defense counsel stated that when he filed the motion, it was his understanding that Defendant was the driver that day and that he was waiting in the driver's seat until at some point, he leaned over and was in the passenger seat when "he got pulled out of the car." Acknowledging that the ownership of the vehicle had not been addressed during the suppression hearing, the Government represented that subsequent investigation revealed that the registered vehicle owner was not Codefendant Hopkins-Brown, but rather, was a person of some relation to him.

In either case, whether Defendant was a driver of the vehicle that day or merely a passenger, the result is the same in that, ultimately, Defendant has failed to meet his burden of demonstrating he has Fourth Amendment standing in this case. As an initial point, the Court notes that it is undisputed and corroborated by Officer Silvey's dash camera video that upon arrival at the scene, Defendant exits from the front passenger side of the vehicle in response to Officer Silvey tapping on the driver side window. Thus, based on the evidence presented to the Court, it would appear Defendant was merely a passenger in the vehicle at the salient time of the search—a fact that indicates Defendant has no Fourth Amendment standing.

Moreover, considering Defendant's assertion that he had previously been driving the car and that he therefore had a property interest in the vehicle, the Court notes several problems with his argument. First, while Defendant proffered that he had been driving the car, Officer Silvey testified that Codefendant Hopkins-Brown, who had fled the scene, had keys to the vehicle. Second, even if Defendant had been driving the car at some earlier point in time, Defendant cites

13

no case law and gives no reason as to why this fact would be relevant at a later point in time when Defendant was seated in the passenger seat. Third, even if Defendant had been the driver at the time of the search—or the fact that he had previously been the driver was relevant at a later period in time—simply the fact Defendant was—or had been— driving would not be enough on its own to grant him a possessory interest in the vehicle absent ownership or authorization to drive from the vehicle's owner.

During argument, defense counsel stated that Defendant had permission to drive the Buick. However, Defendant did not present any evidence or make any assertions as to who owned the vehicle or who gave him permission to drive. The Government, in contrast, noted at the hearing that subsequent investigation revealed that the actual owner of the vehicle was purportedly a relative of Codefendant Hopkins-Brown. There is nothing in the record to indicate Defendant received permission to drive the car from Hopkins-Brown's relative or that Hopkins-Brown received permission from his relative to allow Defendant to drive the vehicle.

Finally, the Court notes that Defendant had a suspended driver's license at the time of his arrest. The Sixth Circuit has considered the fact that a defendant did not have a valid license at the time they were stopped in cases involving rental cars. *See United States v. Pino*, 855 F.2d 357, 360 (6th Cir. 1988); *United States v. Frederickson*, No. 90-5536, 1990 WL 159411, at *3 (6th Cir. Oct. 22, 1990) ("Even assuming that [the defendant] paid to rent the van, she still does not have standing. Her name was not on the rental agreement (a fact that the court found relevant in *Pino*) and she did not have a driver's license on her person (also a fact that this court found relevant in *Pino*)."); *United States v. Walton*, 763 F.3d 655, 663 (7th Cir. 2014) ("The Sixth Circuit is unique in considering possession of a valid license as one factor in the standing analysis."). The Court recognizes these cases present a slightly different factual scenario to the extent rental companies

typically only authorize licensed drivers to drive rental cars.  *But see Walton*, 765 F.3d at 664

(noting the defendant was the only driver on the rental agreement and he had an invalid license);

*United States v. Best*, 135 F.3d 1223, 1225 (8th Cir.1998) (noting an unauthorized driver of a rental

car with an invalid license would have standing if he had the authorized driver's permission to use

the car).  However, the Court still finds the fact that Defendant did not have a valid license to be

relevant, as it would seem less likely that the owner of the vehicle in this case, whoever they are,

would give Defendant permission to drive their car, assuming they knew his license was

suspended.

 In sum, the Court finds Defendant has failed to meet his burden of demonstrating he had

a legitimate expectation of privacy or property interest in the Buick because he was not driving the

car at the time of the search and, even if he was or even if he had previously driven the car, there

is no indication he owned the car or was given permission to drive from the owner.  To the extent

Defendant maintains that Codefendant Hopkins-Brown gave him permission to drive the vehicle,

there is no evidence demonstrating that Hopkins-Brown was authorized by the owner to do so.

Thus, Defendant lacks Fourth Amendment standing.

Although the Court finds that Defendant lacks standing to challenge the search of the

vehicle, the Court will address the merits of his motion regarding the validity of the search in the

event that the District Judge disagrees with the Court's standing analysis.

### B.  Constitutionality of Vehicle Search

While the Constitution's protection against unreasonable searches and seizures extends to

an individual's vehicle, a vehicle is afforded a "lesser degree of protection" such that it is

accordingly subject to several exceptions to the warrant requirement.  *Carney*, 471 U.S. at 390.  If

the search of a vehicle falls within such an exception, the search is still legal even if the officers

did not have a warrant. *Id.* Two of the exceptions to the warrant requirement are the automobile exception and an inventory search. *See e.g., United States v. Galaviz*, 645 F.3d 347, 355 (6th Cir. 2011) ("automobile exception" allows officers to "search a vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime"); *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) (inventory search of a vehicle permissible without a warrant and serves three basic functions (1) securing property, (2) protecting law enforcement from false claims of loss or damage, and (3) protecting law enforcement from possible danger).

Defendant contends that the search of the Buick violated the Fourth Amendment because the officers did not have probable cause to search the vehicle pursuant to the automobile exception and the vehicle was not lawfully in police custody for a valid inventory search. In response, the Government asserts that the search of the car was valid pursuant to both the automobile exception and the inventory search exception to the Fourth Amendment warrant requirement. The Court will consider each exception in turn.

### 1. Automobile Exception

"Even in cases where an automobile [is] not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception." *Carney*, 471 U.S. at 391. Pursuant to the automobile exception, law enforcement may conduct a warrantless search of a vehicle if they have "probable cause to believe that the vehicle contains evidence of a crime." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (internal citations omitted). "Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *Smith v. Thornburg*, 136 F.3d 1070, 1074 (6th Cir. 1998) (quoting *United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994)). "The court's determination of whether probable cause existed at the time of the search is a 'commonsense, practical

question' to be judged from the 'totality-of-the-circumstances.'" *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (quoting *Thornburg*, 136 F.3d at 1074–75).

Here, the Court finds that law enforcement had probable cause that evidence of a crime involving credit cards would be present in the Buick prior to the search. [6] *See United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012) ("[A]n officer may perform a warrantless search of a detained vehicle if the officer has probable cause to believe the vehicle contains contraband or evidence of criminal activity."). At the time of the search, the officers were aware of the following: (1) the initial report from Walmart indicated there were three male subjects trying to purchase multiple prepaid gift cards at the self-checkout using different credit cards to attempt the purchases because the charges were being declined; (2) Walmart provided a description of the individuals and of the vehicle they were using; (3) when the officers arrived and located the vehicle, the two individuals in the car matched the description of the suspects; (4) the third subject, who was presumed to be the driver of the vehicle with possession of the keys, had fled the scene; (5) Codefendant Morgan provided false identification information and did not have a driver's license or any form of identification on his person; (6) Defendant had a suspended driver's license; (7) Codefendant Morgan had gift cards on his person; and (8) officers saw numerous gift cards and credit cards in plain view inside the Buick near where Defendant had been sitting.

Defendant argues that the act of using multiple credit cards at a self-checkout to complete a single transaction is not a crime; however, his argument fails to account for the Walmart report that the credit cards were being declined as well as the numerous other factors contributing to suspected criminality. Both officers also testified that in their experience investigating crimes involving credit cards, the presence of multiple credit cards would be evidence of such crimes.

---

[6]     The Government noted that such crimes could include identity theft, criminal simulations, and criminal conspiracy [Doc. 143 p. 4].

*Ornelas v. United States*, 517 U.S. 690, 699 (1996) (observing that "a police officer may draw inferences based on his own experience in deciding whether probable cause exists"). "In considering the totality of the circumstances, 'we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *United States v. Perez,* 440 F.3d 363, 371 (6th Cir. 2006) (quoting *United States v. Smith,* 263 F.3d 571, 588 (6th Cir. 2001) (additional citation omitted)).

In short, the totality of the circumstances with the information known by the officers at the time provided sufficient probable cause to search the Buick without a warrant under the automobile exception.

### 2.      Inventory Search

Another exception to the warrant requirement is the inventory search. "An inventory search is a recognized exception to the Fourth Amendment's warrant requirement: where the police are in lawful custody of a vehicle, they may conduct an inventory search to catalogue its contents pursuant to standardized criteria." *United States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020) (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990), *cert. denied*, 141 S. Ct. 333 (2020); *see also Colorado v. Bertine*, 479 U.S. 367, 375–76 (1987). "A warrantless inventory search may only be conducted if police have lawfully tak[en] custody of a vehicle." *United States v. Smith,* 510 F.3d 641, 651 (6th Cir. 2007) (internal quotations omitted).

The Sixth Circuit recently summarized that:

> Officers exercising their discretion to impound a vehicle must do so "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." [*United States v. Jackson*, 682 F.3d 488, 454 (6th Cir. 2012)] (quoting *United States v. Kimes*, 246 F.3d 800, 805 (6th Cir. 2001)). Similarly, "[i]n order to be deemed valid, an inventory search may not be undertaken 'for purposes of investigation,' and it must be conducted 'according to standard police procedures.'" *Smith*, 510 F.3d at 651 (quoting

18

> *United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir. 1998)); *see also United States v. Alexander*, 954 F.3d 910, 916 (6th Cir. 2020) (stating that the inventory exception applies only when officers follow "'standardized criteria' or 'established routine' governing the scope of the inventory searches'" (quoting *Florida v. Wells*, 495 U.S. 1, 4, (1990))). The search is unconstitutional if "the evidence establishes that the 'police acted in bad faith or for the sole purpose of investigation' in conducting an inventory search." [*United States v. Hockenberry*, 730 F.3d 645, 659 (6th Cir. 2013)] (quoting *United States v. Vite-Espinoza*, 342 F.3d 462, 470 (6th Cir. 2003)). In other words, officers cannot hide an investigative search under the pretext of an inventory search. *See id.*; *South Dakota v. Opperman*, 428 U.S. 364, 375–76 (1976). That said, "the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search." *Smith*, 510 F.3d at 651.

*United States v. Snoddy*, 976 F.3d 630, 634 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 1430 (2021). The Sixth Circuit has "held that while such a policy must be sufficiently well-defined, it does not necessarily have to be written." *Alexander*, 954 F.3d at 915 (citing *United States v. Tackett*, 486 F.33d 230, 233 (6th Cir. 2007)).

Defendant maintains that the inventory search exception would not apply in this instance because the car was not lawfully in police custody and that the search was a pretext for the officers' warrantless investigatory search. The Government counters that once Defendant and Codefendant Morgan were placed under arrest, the officers conducted a valid inventory search as the vehicle was to be towed and lawfully impounded per the LCPD Policy.

Defendant's argument that the officers were not lawfully in possession of the vehicle seems to center on the fact that the LCPD Policy provided alternatives to impoundment that were not afforded to Defendant such as allowing the opportunity to call someone to pick up the car; allowing Defendant to arrange for towing; or leaving the car parked in the Walmart parking lot.[7] The Court

---

[7]    At the evidentiary hearing, defense counsel argued that the officers lacked probable cause to arrest Defendant Smith and that his illegal arrest tainted and invalidated the inventory search. Under Tennessee law, "[a] person commits the offense of criminal simulation who, with knowledge of its character, possesses: . . . [a]ny instrument, apparatus or contrivance designed, adapted or used for commission of any theft of property or services by fraudulent means." Tenn. Code Ann. § 39-14-115(a)(2)(B). Additionally, "[a] person commits the crime of fraudulent use

19

finds this argument unavailing as an impoundment decision will not be impermissible simply because alternatives to impoundment might exist. *Hockenberry*, 730 F.3d at 658–59; *see also Kimes,* 246 F.3d at 805 (holding that officers were not required to "take[ ] it upon themselves to call [the defendant's] wife and ask her to get the vehicle"); *cf. United States v. Agofsky,* 20 F.3d 866, 873 (8th Cir. 1994) ("Nothing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory."). In addition, Sergeant Reagan testified that most, if not all, of the alternatives were unavailable in this instance because Defendant was not the owner of the car.

The decision Sergeant Reagan made to impound the vehicle and to have it towed was consistent with the LCPD Policy, which provides for lawful seizure and impoundment of a vehicle upon an arrest[8] and requires an inventory of all property in the vehicle. In addition, Sergeant Reagan testified that, in this instance, the vehicle also had evidentiary value and therefore, the LCPD Policy would not allow for attempts to otherwise dispose of the vehicle prior to impoundment.

Defendant argues that the inventory search was a pretextual investigatory search, and the officers otherwise lacked probable cause to obtain a search warrant. Again, the Court finds this argument unavailing as the Court has already determined that there was probable cause for the

---

of a credit or debit card who uses, or allows to be used, a credit or debit card or information from that card, for the purpose of obtaining property, credit, services or anything else of value with knowledge that: . . . [t]he card is forged or stolen [or] the use of the card is unauthorized by either the issuer or the person to whom the credit or debit card is issued." Tenn. Code Ann. § 39-14-118(b)(1) & -(4). The Court finds the officers had probable cause to arrest Defendant Smith for criminal simulation or unauthorized use of a credit or debit card based on the totality of the circumstances discussed in section A. above.

[8]     The LCDP Policy permits the officer to impound a vehicle that has been lawfully seized [Exh. 3 p. 1]. The Policy references the arrest of a driver for driving under the influence of an intoxicant or the recovery of a stolen vehicle as examples of situations in which impounding a vehicle is appropriate [*Id.*].

search based on the reasons outlined above. Additionally, an officer's "[d]iscretion as to impoundment is permissible 'so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *Jackson*, 682 F.3d at 454 (quoting *Bertine*, 479 U.S. at 375–76). An officer's decision to impound a vehicle and conduct an inventory search serves to protect, among other things, an owner's property, and property protection is a legitimate concern particularly where the vehicle did not belong to Defendant. *See Lumpkin*, 159 F.3d at 987 (citing *Bertine,* 479 U.S. at 372).

Here, the officers' decision to impound and inventory the vehicle was supported by the exigent facts and consistent with the LCPD Policy. Neither of the immediate occupants of the Buick were the owner of the vehicle, both occupants had been arrested, and the car had evidentiary value. Accordingly, these circumstances fell within the inventory search exception to the Fourth Amendment warrant requirement.

In sum, the Court concludes that both the automobile exception and the inventory search exception to the warrant requirement apply. Thus, even if Defendant had standing to challenge search, the search of the Buick did not violate the Fourth Amendment.

## IV. RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 142] be **DENIED**, both on the substantive issues surrounding the search and, because Defendant lacks standing to challenge the search of the vehicle.[9]

Respectfully submitted,

*Debra C. Poplin*

Debra C. Poplin
United States Magistrate Judge

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).